```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

WILLIAM G. CARTER,                )
                                  )
            Plaintiff,             )
                                  )
        v.                         )      No. 4:05 CV 2259 DDN
                                  )
JULIA HASSELL,                     )
and JANET SIDEBOTTOM,              )
                                  )
            Defendants.            )

## **MEMORANDUM**

This action is before the court on the motion of defendants Julia Hassell and Janet Sidebottom for summary judgment. (Doc. 91.) The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 32.) The court held a hearing on the matter on November 5, 2009.

## **I. BACKGROUND**

William Carter brought this action against defendants Julia Hassell and Janet Sidebottom, alleging they violated his civil rights under 42 U.S.C. § 1983. (Doc. 62.)

According to the amended complaint, in late 2003 or early 2004, a fight broke out among inmates in the Missouri Sexual Offender Treatment Center (MSOTC), where Carter was civilly committed. (Doc. 62 at ¶¶ 1, 9.) Carter alleges that he was in the room where the fight happened, but that he was not involved in the fight. (Id. at ¶¶ 9-10.) According to the amended complaint, Julia Hassell, one of the guards at MSOTC, thought Carter was involved in the fight. (Id. at ¶¶ 8, 10.) In responding to the fight, Hassell allegedly struck Carter in the head with the body of her walkie-talkie, and then allegedly held him to the ground. (Id. at ¶¶ 11-12.)

Carter also alleges that he suffered from a chipped tooth with a loose filling. (Id. at ¶ 26.) Despite this condition, Janet

Sidebottom, a nurse at MSOTC, allegedly ignored Carter's requests to see a dentist and his requests for pain medication. (Id. at ¶¶ 27-28.)

In Count I of his amended complaint, Carter asserts a claim for excessive force against Hassell. (Id. at 2.) In Count II, he asserts a claim of assault and battery against Hassell. (Id. at 2-3.) In Count III, he asserts a claim of deliberate indifference against Sidebottom. (Id. at 3-4.) Carter brings the claims against Hassell and Sidebottom in their individual and official capacities. (Id. at ¶ 6.) Hassell and Sidebottom deny the allegations against them. (Doc. 70; Doc. 80.)

## II. SUMMARY JUDGMENT ARGUMENTS

Hassell and Sidebottom move for summary judgment on all claims. Hassell argues that the amount of force she used (assuming she actually used any force) was justified under the circumstances, and that a reasonable officer would have reacted just as she did. Hassell also argues that Carter's injuries were so minimal that the injuries fail to amount to a constitutional violation. Sidebottom argues that Carter did not suffer from any objectively serious medical need. Hassell and Sidebottom each argue that they are entitled to qualified immunity because they did not violate a clearly established right. They also argue that the Eleventh Amendment shields them from Carter's official-capacity claims. (Docs. 93, 96.)

In response, Carter argues genuine issues of material fact are in dispute, and that the case should be decided by a jury. In particular, Carter argues that Hassell has taken inconsistent positions concerning the actions she took. He also argues that the extent of his injuries is immaterial; what matters is the amount of force Hassell used. Carter argues that his tooth pain qualifies as a serious medical need, and that he notified Sidebottom of his tooth pain. Finally, Carter argues that his rights were clearly established. (Doc. 94.)

## III. STATEMENT OF UNDISPUTED FACTS

William Carter is civilly committed to the MSOTC, where he has been living for the past nine years. (Doc. 92, Ex. A at 3; Carter depo. at 6.) Julia Hassell has worked at MSOTC since 1999, when the program

first opened. (Doc. 92, Ex. B at 3; Hassell depo. at 7.) Janet Sidebottom worked as a nurse at MSOTC from 2002 until 2004. (Doc. 92, Ex. C at 4; Sidebottom depo. at 14-15.) Sidebottom earned a baccalaureate in nursing from the University of South Carolina, and a masters in nursing from Vanderbilt University. (Doc. 92, Ex. C at 2; Sidebottom depo. at 7.)

**Allegations against Hassell**

On December 9, 2004, Hassell responded to a "Code 10" in the Hoctor 3 day room, after a fight broke out between two of the residents. (Doc. 92, Ex. F at 2.) A "Code 10" means there is a resident out of control on the ward, and that further assistance is needed. (Doc. 92, Ex. B at 5; Hassell depo. at 14.) This definition describes a fight between residents. (Id.) When the fight broke out, Hassell was behind the nurses' station. (Doc. 92, Ex. B at 7; Hassell depo. at 25.) In response to the "Code 10," Hassell testified that she removed her badge, her ink pen, and her radio, and entered the day room, where she saw one resident choking a seated resident. (Id.) Hassell grabbed the aggressor's leg, and tried to separate him from the victim. (Doc. 92, Ex. B at 8; Hassell depo. at 29.) It took three to four minutes, and several other aides to break up the fight. (Doc. 92, Ex. B at 8-9; Hassell depo. at 29, 32.)

According to Hassell, Carter was seated about five feet away from the incident, but did not get involved in the altercation. (Doc. 92, Ex. B at 10; Hassell depo. at 34-35.) In her deposition, Hassell testified that she did not hit, tackle, or otherwise touch Carter in any way, when she responded to the fight. (Id.) MSOTC staff members may not hit or punch residents, even when attempting to break up a fight between residents. (Doc. 92, Ex. B at 4; Hassell depo. at 13.)

Leon Maxwell, a security attendant at MSOTC, also responded to the "Code 10." (Doc. 92, Ex. D at 3-4; Maxwell depo. at 6, 10-11.) In his deposition, Maxwell testified that Carter was not involved in the fight, and that no one confronted him or physically touched him. (Doc. 92, Ex. D at 5-6; Maxwell depo. at 17-19.) He estimated that Carter was more

than five feet away from the residents who were fighting. (Doc. 92, Ex. D at 5; Maxwell depo. at 17.)

In his deposition, Carter confirmed that a fight broke out between two residents in the day room. (Doc. 92, Ex. A at 4; Carter depo. at 13.) Carter stated that he was standing about two feet from the fight when Hassell came running into the room. (Id.) According to his deposition testimony, Hassell hit him in the head with her walkie-talkie, knocked him to the ground with a leg-sweep, put his hands behind his back, and instructed him to stop fighting. (Id.) Carter stated that while he was on the ground and Hassell had her knee in his back, he protested that he had not been involved in the fight. (Doc. 92, Ex. A at 6; Carter depo. at 20.) According to Carter, Hassell allowed him to get back up, after which, she locked him in his room for about twenty minutes. (Doc. 92, Ex. A at 6; Carter depo. at 21.) Carter stated that he believed Hassell ran towards him, because she thought he was involved in the fight that day. (Doc. 92, Ex. A at 6; Carter depo. at 18.)

After the incident in the day room, Carter filed a complaint against Hassell, alleging she tackled him to the floor, which scratched his face, when she responded to the "Code 10." (Doc. 92, Ex. F at 1-3.) Qualls, an outside investigator, interviewed Carter, Hassell, and Maxwell in the course of investigating the matter. (Id. at 2-5.) Qualls prepared a written report of his investigation. (Id. at 1-5.) This report does not mention Carter's allegation that Hassell struck him with her walkie-talkie. (See id.)

This complaint was not the first time Carter complained about Hassell; he had repeatedly complained about Hassell, and even tried to get her removed from Hoctor 3. (Doc. 92, Ex. B at 13; Hassell depo. at 48-49.) Carter has also included Hassell in his lawsuits. On December 17, 2004, Carter filed a motion seeking to add Hassell as a defendant in a lawsuit. Carter v. Shuffman, No. 4:04 CV 927 RWS (E.D. Mo. Dec. 17, 2004) (Doc. 27). In that motion, Carter alleged that Hassell called him a "MotherFucker," and struck him in the back of the head with her walkie-talkie on October 1, 2004. (Id. at 1.) In his report, Qualls reported that Carter claimed Hassell had hit him in the back of the head with a walkie-talkie in an earlier incident. (Doc. 92, Ex. F at 3.)

On November 23, 2005, Carter filed this lawsuit, alleging, among other things, that Hassell struck him in the head with her walkie-talkie and held him to the ground. (Doc. 62 at ¶¶ 11-12.) As a result of these alleged actions, Carter testified that he received a small cut and a bruise on his head, and he experienced soreness in his wrists from when he used his hands to stop his fall. (Doc. 92, Ex. A at 7-8; Carter depo. at 24-26.) Carter also stated that he sometimes got headaches, but that he was not sure if the headaches stemmed from the incident or his medication. (Doc. 92, Ex. A at 7; Carter depo. at 25.) At the time of the deposition, Carter was taking Risperdal, Melatonin, Trazodone, and Allegra. (Doc. 92, Ex. A at 2; Carter depo. at 5.) Carter never received any medical treatment for his alleged injuries. (Doc. 92, Ex. A at 13; Carter depo. at 46.)

**Allegations against Sidebottom**

Carter testified that, sometime after 2002, he bit into some food, chipping his upper middle tooth, on the left side of his jaw. (Doc. 92, Ex. A at 14; Carter depo. at 51.) According to his deposition testimony, there was no filling in this tooth.[1] (Id.) During the deposition, Carter stated that he filed his first medical request within a week of chipping his tooth, and filled out three or four total requests within a month of chipping his tooth. (Doc. 92, Ex. A at 14-16; Carter depo. at 51, 57-58.) According to Carter, these requests were given to lower level staff, who were charged with forwarding the requests to the appropriate medical staff member. (Doc. 92, Ex. A at 16; Carter depo. at 59.) The MSOTC residents are not supposed to talk to the nurse practitioners and doctors directly. (Doc. 92, Ex. A at 15; Carter depo. at 57.) However, Carter testified that he spoke with Sidebottom about his tooth pain, and that she acknowledged receiving his medical request. (Doc. 92, Ex. A at 14, 16; Carter depo. at 53, 58.)

Sidebottom had previously seen Carter for back pain. (Doc. 92, Ex. C at 7; Sidebottom depo. at 25.) However, she could not remember

---

[1]In contrast, Carter's amended complaint alleged that he chipped a tooth "from which a filling was coming loose." (Doc. 62 at ¶ 26.)

whether Carter had ever complained to her about a chipped tooth. (Doc. 92, Ex. C at 11; Sidebottom depo. at 42.) At some point in time, though, Sidebottom completed a dental care request for Carter to see Dr. Arthur Wieselthier, DDS. (Doc. 92, Ex. C at 7; Sidebottom depo. at 25-26.) On January 31, 2004, Carter filed a grievance in which he requested to see a dentist. (Doc. 95, Ex. 1.) On September 28, 2004, Carter filed a new grievance involving Sidebottom, accusing her of neglecting to treat a redness and pain in the lower right portion of his jaw. (Doc. 95, Ex. 4 at 3.)

On March 19, 2004, Carter was transported to the St. Louis Psychiatric Rehabilitation Center, so Dr. Wieselthier could examine him. (Doc. 92, Ex. E at 2; Wieselthier depo. at 6; Doc. 92, Ex. G.) Dr. Wieselthier earned a dental degree in 1975, and has been practicing in the field of dentistry since that time. (Doc. 92, Ex. E at 2; Wieselthier depo. at 7-8.) During the visit, Dr. Wieselthier examined Carter's teeth, and took eighteen x-rays of his teeth. (Doc. 92, Ex. E at 6; Wieselthier depo. at 22.) The examination and x-rays revealed no tooth decay and no chipped teeth. (Doc. 92, Ex. E at 6, 8; Wieselthier depo. at 22-23, 32.) A chipped tooth can produce a variety of symptoms, from temperature sensitivity, to slight pain when chewing, to "horrible symptoms" in the case of decay into the nerve. (Doc. 92, Ex. E at 4; Wieselthier depo. at 13-14.)

During oral examinations, Dr. Wieselthier asks his patients if they are experiencing pain. (Doc. 92, Ex. E at 8; Wieselthier depo. at 8.) According to Carter's chart, Carter did not complain of any pain in his teeth or gums during the visit. (Id.) However, Dr. Wieselthier found Carter had poor oral hygiene, with moderate gingivitis generally, and severe gingivitis at the lower incisors (the four bottom front teeth). (Doc. 92, Ex. G at 2.) Moderate gingivitis is characterized by inflammation of the gums, with easy bleeding and a little redness. (Doc. 92, Ex. E at 4, 6; Wieselthier depo. at 15-16, 23-24.) Severe gingivitis is characterized by obvious swelling in the gums, with very easy bleeding upon touch. (Id.) Gingivitis does not generally cause pain, though it can in rare occasions, and Dr. Wieselthier had seen

patients with pain from gingivitis. (Doc. 92, Ex. E at 4; Wieselthier at 15.)

Dr. Wieselthier recommended daily brushing and flossing for Carter, which would reduce the gingival inflammation. (Doc. 92, Ex. G at 2.) Removing debris from the teeth can almost completely eliminate gingivitis. (Doc. 92, Ex. E at 7; Wieselthier depo. at 25.) In fact, except for crowding in the lower anterior, Dr. Wieselthier found Carter "would have a nice set of teeth if his oral hygiene became good." (Doc. 92, Ex. E at 8; Wieselthier depo. at 30.)

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007). The court must view the evidence in the light most favorable to the nonmoving party and accord it the benefit of all reasonable inferences. Devin, 491 F.3d at 785. A fact is "material" if it could affect the ultimate disposition of the case, and a factual dispute is "genuine" if there is substantial evidence to support a reasonable jury verdict in favor of the non-moving party. Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial. Celotex, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings but must instead proffer admissible evidence that demonstrates a genuine issue of material fact. Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir. 2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).

### V. DISCUSSION

Section 1983 provides a civil action against any individual, who under color of state law, causes a deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the

United States. 42 U.S.C. § 1983; McRaven v. Sanders, 577 F.3d 974, 979 (8th Cir. 2009).

**Official Capacity**

Carter has sued Hassell and Sidebottom in both their individual and official capacities. (Doc. 62 at ¶ 6.) In each of his three claims, Carter prays for money damages. (Id. at 1-5.)

The Eleventh Amendment bars § 1983 claims for damages against defendants acting in their official capacities. Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997). The Eleventh Amendment does not bar § 1983 damage claims against defendants acting in their personal capacity. Id. Accordingly, the § 1983 damage claims against Hassell and Sidebottom, acting in their official capacities, are dismissed with prejudice. See id. The § 1983 damage claims against Hassell and Sidebottom, acting in their personal capacities, may go forward. See id. at 755.

With limited exceptions, sovereign immunity protects government officials from lawsuits in which they are sued in their official capacities. Shell v. Ebker, No. 4:04 CV 1817 CAS, 2006 WL 1026982, at *9 (E.D. Mo. Apr. 14, 2006). Sovereign immunity extends even to intentional torts like assault and battery. Id. (citing Carmelo v. Miller, 569 S.W.2d 365, 367-68 (Mo. Ct. App. 1978)). Accordingly, the state law claims for assault and battery against Hassell, acting in her official capacity, are dismissed with prejudice. See id. at *9-*10. The state law claims for assault and battery against Hassell, acting in her personal capacity, may go forward. See id. at *11.

**Excessive Force Claim**

The Fourth Amendment's objective reasonableness standard governs excessive force claims brought by civilly committed patients. Andrews v. Neer, 253 F.3d 1052, 1060-61 (8th Cir. 2001). To satisfy this standard in a § 1983 action, the plaintiff must show there was a seizure, and that the use of force during the seizure was objectively

unreasonable. Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007 (8th Cir. 2003). Under the Fourth Amendment, a seizure occurs when a public official restrains a person's liberty through physical force or a show of authority. Shell, 2006 WL 1026982, at *5.

The question of whether a seizure was reasonable or not depends on the totality of the circumstances, and is based on the viewpoint of a reasonable officer on the scene. Id. Three factors that help inform whether the amount of force was reasonable are (1) the severity of the crime at issue, (2) whether the individual posed an immediate safety threat to the official or others, and (3) whether the individual was resisting arrest or attempting to flee.[2] Wertish v. Krueger, 433 F.3d 1062, 1066 (8th Cir. 2006); Id. The court may also consider the result of the alleged force. Crumley, 324 F.3d at 1008 (holding that the plaintiff's injuries were "too minor to support an excessive force claim."). Beyond these factors, the question of whether the amount of force was reasonable must allow for the fact that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989).

For purposes of summary judgment, the court may not pick and choose facts from all the available evidence, in an effort to create the record most favorable to the non-moving party. Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (en banc). Faced with conflicting facts and testimony, the court must credit Carter's version of the events "as a unified whole." Sullivan v. City of Satsuma, Civ. A. 04-0473-WS-M, 2005 WL 2895983, at *3 (S.D. Ala. Oct. 28, 2005). "If a plaintiff's sworn narrative of events is part of the summary judgment record, then the legal viability of his case must be ascertained by reference to that narrative, taken as a whole, not just the portions that he finds convenient or helpful." Id.

---

[2]In the context of pretrial detainees - and therefore civilly committed patients - these three factors may not always be relevant. Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1197 n.21 (9th Cir. 2002); Andrews, 253 F.3d at 1061.

In this case, Carter has testified that he was not involved in the fight that day. Hassell and Maxwell have each confirmed that Carter was not involved in the altercation. Carter also testified that Hassell hit him in the head with her walkie-talkie, knocked him to the ground with a leg-sweep, and put his hands behind his back. Viewing the facts in the light most favorable to the plaintiff, Carter has proffered evidence of a deprivation of his constitutional rights.

At the time of the incident, Carter was not fighting with anyone, did not pose any safety threat, and was not resisting MSOTC officials. See Smoak v. Hall, No. 08-5442, 2009 WL 2778101, at *6 (6th Cir. Sept. 2, 2009) ("There is no government interest in striking someone who is neither resisting nor trying to flee."). Carter was an innocent party during the fight between the residents, and during the "Code 10." Yet, Hassell allegedly struck him in the back of the head with a walkie-talkie and leg-swept him. A jury could find these actions amounted to excessive force. See Anderson v. Jackson, Civil Action No. 1:08 CV 175 MHT, 2009 WL 2601388, at *3 (M.D. Ala. Aug. 21, 2009) ("[S]triking a cuffed, compliant individual with sufficient force to fracture his jaw serves no legitimate law-enforcement purpose and amounts to . . . excessive force.").

Simply put, state officials "do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996); see also Smoak, 2009 WL 2778101, at *6 ("The law is clear that force can easily be excessive if the suspect is compliant."). Under the circumstances alleged, Julia Hassell did not have any justification or excuse for using force against Carter. Crediting Carter's testimony as a whole, Hassell's conduct would have violated clear constitutional bounds. See Shell, 2006 WL 1026982, at *6. Summary judgment is therefore inappropriate.

Hassell points to two cases in which courts found the use of force with a walkie-talkie to be reasonable. (Doc. 93 at 6) (citing Butler v. Hutson, 147 F. App'x 62, 64 (11th Cir. 2005) (per curiam); Johnson v. LaRabida Children's Hosp., 372 F.3d 894, 898 (7th Cir. 2004)). In each case, though, the plaintiff was not an innocent party. In Butler,

the plaintiff posed a threat to another inmate, had already been fighting with that inmate, and had disobeyed a guard's order to remain seated. Butler, 147 F. App'x at 64-65. In Johnson, the plaintiff had, by her own admission, threatened hospital staff with bodily harm, battered a security guard, and created dismay. Johnson, 372 F.3d at 898. Because Carter was an innocent party, these cases are easily distinguished.

Hassell also argues that Carter's injuries are insufficient to amount to a constitutional violation. (Doc. 93 at 7.) An excessive force claim requires more than a de minimus injury. Crumley, 324 F.3d at 1007. But where there is an actual, constitutional injury, that injury can amount to the necessary level of injury. See Mayard v. Hopwood, 105 F.3d 1226, 1228 (8th Cir. 1997) (finding the officer's actions were such that the constitutional injury was "presumed to flow from the wrong itself"). Carter has alleged that he was hit in the head with a walkie-talkie and knocked to the ground for no justifiable reason. From these alleged actions, Carter has stated that he received a small cut and bruise on his head, had soreness in his wrists, and experienced periodic headaches. Viewing the facts in the light most favorable to the plaintiff, Carter has established that he suffered more than a de minimus injury.

Carter's claim of excessive force against Julia Hassell, in her individual capacity, shall proceed to trial.

**Assault and Battery Claim**

An assault is any "unlawful offer or attempt to injure another with the apparent present ability to effectuate the attempt under circumstances creating a fear of imminent peril." Armoneit v. Ezell, 59 S.W.3d 628, 632 (Mo. Ct. App. 2001). A battery is the willful, offensive touching of another person, and can be seen as the consummation of an assault. Phelps v. Bross, 73 S.W.3d 651, 656 (Mo. Ct. App. 2002); Id. Every battery contains an assault. Armoneit, 59 S.W.3d at 632.

In his deposition testimony, Carter stated that Hassell hit him in the head with her walkie-talkie, knocked him to the ground with a leg-

sweep, and put his hands behind his back. While he was on the ground, he testified that Hassell had her knee in his back. Viewing this testimony in the light most favorable to the plaintiff, Carter has established a claim for assault and battery. Summary judgment is inappropriate on these two claims.

**Qualified Immunity Defense**

Hassell argues that she is entitled to qualified immunity because Carter cannot establish the violation of a clearly established right.

The doctrine of qualified immunity strikes a balance between holding public officials accountable for exercising power irresponsibly, and shielding officials from harassment and liability for performing their duties reasonably. Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). To that end, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." McRaven, 577 F.3d at 979. These protections apply regardless of whether the government official's error is a mistake of law, a mistake of fact, or some combination of the two. Pearson, 129 S. Ct. at 815. To overcome the defense of qualified immunity, a plaintiff must show that (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right, and (2) the right was clearly established at the time of the deprivation. Id. at 815-16. For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

As noted above, when viewed in the light most favorable to the plaintiff, Carter has established a deprivation of his constitutional rights. At the time of the deprivation, the right to be free from excessive force was clearly established. See Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006) ("[T]he right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures."). Hassell is not entitled to qualified immunity.

**Deliberate Indifference Claim**

Deliberate indifference to a prisoner's serious medical needs is an unnecessary and wanton infliction of pain, in violation of the Eighth Amendment. McRaven, 577 F.3d at 979. This is true whether the indifference stems from prison guards intentionally denying or delaying access to medical care, from prison guards intentionally interfering with prescribed treatments, or from prison doctors responding to a prisoner's needs. Id. Taken together, any official who exhibits deliberate indifference to a prisoner's medical needs is subject to suit under § 1983. Id.

Carter is a civilly committed patient, not a prisoner. See Andrews, 253 F.3d at 1060-61. As a result, his claims are evaluated as if he was a pretrial detainee. Id. at 1061. A court evaluates a pretrial detainee's § 1983 claim of deliberate indifference under the Due Process Clause of the Fourteenth Amendment, and not under the Eighth Amendment. McRaven, 577 F.3d at 979. From a practical standpoint, this distinction makes little difference; "[p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Id. at 979-80.

To succeed on his deliberate indifference claim, Carter must prove by a preponderance of the evidence that (1) he had an objectively serious medical need, and (2) the defendants actually knew of the medical need, but were deliberately indifferent to that need. Jones v. Minn. Dep't of Corrs., 512 F.3d 478, 481 (8th Cir. 2008). A medical need is objectively serious if it has been diagnosed by a physician as requiring treatment, or if it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Id.

Determining whether a medical need is objectively serious is a factual finding. Id. at 482. However, if no reasonable jury could find that the plaintiff suffered from an objectively serious medical need, summary judgment is appropriate. See id. An inmate's complaints of teeth or gum problems can be serious enough to survive summary judgment. See, e.g., Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004); Moore v. Jackson, 123 F.3d 1082, 1085 (8th Cir. 1997) (per curiam); Fields v. Gander, 734 F.2d 1313, 1314-15 (8th Cir. 1984). In

Hartsfield, the "plaintiff presented evidence that he suffered extreme pain from loose and infected teeth, which caused blood to seep from his gums, swelling, and difficulty sleeping and eating." Hartsfield, 371 F.3d at 457. In Moore, the facts showed that the plaintiff suffered from an infected tooth, which ultimately had to be extracted. Moore, 123 F.3d at 1086. In Fields, the facts showed that the plaintiff suffered from a swollen face and an infected tooth, which ultimately had to be extracted. Fields, 734 F.2d at 1314-15.

Viewing the evidence in the light most favorable to the plaintiff, Carter has failed to show he suffered from an objectively serious medical need. During his dental visit, Dr. Wieselthier examined Carter's teeth and took eighteen x-rays of his teeth. Between the x-rays and Dr. Wieselthier's examination, there was no evidence of any tooth decay or chipped teeth. During his deposition, Dr. Wieselthier noted that Carter's chart indicated he had not complained of any pain in his teeth or gums. Dr. Wieselthier found Carter had gingivitis, but only recommended flossing and brushing in response. In fact, if Carter followed good oral hygiene, Dr. Wieselthier testified that he "would have a nice set of teeth. . . ." (Doc. 92, Ex. E at 8; Wieselthier depo. at 30.)

Carter has failed to proffer any legally sufficient evidence that his tooth problem amounted to an objectively serious medical need. There in no evidence in the record Carter suffered from an infected tooth, much less a chipped tooth. In fact, his deposition testimony contradicts allegations found in his complaint. Compare (Doc. 92, Ex. A at 14; Carter depo. at 51) (noting there was no filling in the chipped tooth), with (Doc. 62 at ¶ 26) (alleging there was a filling in the chipped tooth). Carter has failed to demonstrate that a genuine issue of material fact exists with respect to his deliberate indifference claim. Fed. R. Civ. P. 56(e). Summary judgment is therefore appropriate.

## VI. CONCLUSION

For the reasons stated above, the motion of defendants Julia Hassell and Janet Sidebottom for summary judgment (Doc. 91) is granted in part and denied in part. The claims for excessive force and assault

and battery against Hassell, acting in her personal capacity, shall proceed to trial.  The claim for deliberate indifference against Sidebottom is dismissed with prejudice.  The case against Sidebottom is terminated.

    An appropriate order is issued herewith.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on November 10, 2009.